UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DAVID P. FLICK,

        Plaintiff,

vs.

SEETHA VADLAMUDI, M.D., *et al.*,

        Defendants.

_____/

Case No. 1:09-cv-647

Hon. Robert J. Jonker


**REPORT AND RECOMMENDATION**

        This is a civil rights action brought by a former state prisoner pursuant to 42 U.S.C. § 1983. This matter is now before the court on the following motions:

        1.      "Defendants Vadlamudi, Pandya, Mazardo, Sizer and Ayers's Motion for summary judgment under Fed. Rules Civ. Proc. 56(b)" (docket no. 38);

        2.      "Defendants, Correctional Medical Services, Inc., Rocco Demasi, M.D., Valoria Hammond, N.P., and Scott Holmes, M.D.'s Motion to dismiss pursuant to 42 U.S.C. § 1997e(a) and Fed. Rules Civ. Proc. 12(b)(6)" (docket no. 46);

        3.      "Plaintiff's Motion for Preliminary Injunction" (docket no. 76); and

        4.      "Plaintiff's Motion for Preliminary Injunction (2) as it pertains to defendants, Pandya, Manzardo, Sizer and Ayers only" (docket no. 93).

**I.      Background**

        Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468

U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Plaintiff suffers from headaches. He has filed a 230-paragraph verified complaint, consisting of 28 causes of action against ten defendants: Seetha Vadlamudi, M.D.; Benjamin Scarff, D.O.; Valerie Hammond, N.P.; Scott L. Holmes, M.D.; Harash Pandya, M.D., Regional Medical Officer (RMO) for Region II of the Michigan Department of Corrections (MDOC); Alan Mansardo, R.N.; Matt Sizer, R.N.; Shannon Ayers, Pharmacy Assistant; Rocco Demasi, M.D.; and Correctional Medical Services, Inc. (CMS).

Given the lengthy complaint filed in this action, which chronicles plaintiff's health care treatment from 2005 through 2009, it is necessary to review plaintiff's allegations in detail. On July 15, 2005, while at Bellamy Creek Correctional Facility (IBC), plaintiff kited health care because he was suffering from "five to 10 headaches" per month. Compl. at ¶ 25. Plaintiff was seen by a nurse on July 22nd and subsequently examined by a physician's assistant, P.A. Wisniewski, on October 17th. *Id.* at ¶¶ 26-27. The physician's assistant advised plaintiff that he had swollen lymph nodes and possible sinusitis, and prescribed sinus medication, an antibiotic and x-rays of his nasal cavity. *Id.* at ¶ 28. Although the radiologist concluded that plaintiff had no abnormalities, Wisniewski disagreed and scheduled him for a follow-up visit. *Id.* at ¶ 29. On December 6, 2005, plaintiff saw P.A. Torsky, who thought that plaintiff probably had migraines instead of a sinus infection, prescribed an "anti-migraine drug" ( i.e., six 2.5 mg Zomig tablets per month), and scheduled for a follow-up visit. *Id.* at ¶ 30.

Plaintiff saw P.A. Torsky again on March 16, 2006. *Id.* at ¶ 32. Torsky renewed his prescription and scheduled a follow-up appointment. *Id.*

Plaintiff also alleged that he saw Nurse Practitioner N.P. Hammond on March 16th. *Id.* at ¶ 117. After plaintiff advised N.P. Hammond that he had 15 to 20 headaches per day, that the headaches caused periodic nosebleeds, and that he is bedridden when he runs out of Zomig, Hammond increased the Zomig from six 2.5 mg pills a month to twenty 5 mg pills per month. *Id.*[1] Plaintiff states that he had unspecified "follow up" visits with Hammond but that she did not examine him. *Id.*

On one of these visits, on June 2, 2006, plaintiff states that he had nosebleeds and "again requested to see a specialist" because none of the physicians agreed on a cause for his headaches.[2] *Id.* at ¶ 33. Plaintiff requested an increase his Zomig prescription from six 2.5 mg pills to twenty 5 mg pills per month, as well as a CT scan and MRI scan. *Id.* N.P. Hammond denied plaintiff's request for a CT scan or MRI. *Id.* Plaintiff kited N.P. Hammond on July 14th reporting more frequent headaches and advising that he was" running out of Zomig." *Id.* at ¶ 34. N.P. Hammond examined plaintiff on July 31st and prescribed Elavil, "an antidepressant medication apparently used for headaches." *Id.* at ¶ 35. On October 6th, plaintiff had an unscheduled visit to the IBC Healthcare Services (HCS) "to see why he was not getting the prescribed twenty 5 mg Zomig pills per month." *Id.* at ¶ 36. A nurse advised plaintiff that, per N.P. Hammond, the pharmacy will not allow a prisoner to receive more than six 5 mg Zomig pills per month due to

---

[1]Although Nurse Practitioner allegedly changed plaintiff's Zomig prescription to twenty 5 mg. pills per month, a prescription in this amount was not recommended by the drug's manufacturer. *See, infra.*

[2]Contrary to this allegation, plaintiff does not indicate elsewhere that he requested to see a specialist prior to June 2, 2006.

manufacturer's restrictions. *Id.* at ¶ 36. Plaintiff kited N.P. Hammond on October 15th, explaining that he suffers 10 to 20 headaches per month and that "the lack of Zomig pills" causes him to be bedridden and suffer up to 14 headaches a month and requested to see a specialist. *Id.* at ¶ 37. A few days later, plaintiff received a progress note which reflected that on the previous August 29, 2006, a treatment plan was developed and that plaintiff agreed to limit the Zomig prescription to six pills per month. *Id.* at ¶ 38. Plaintiff kited N.P. Hammond on October 18th and stated that he did not agree to decrease the medication. *Id.* at ¶ 39. Plaintiff kited Hammond again on October 30th complaining of 16 headaches in the month of October, with nosebleeds, and an inadequate supply of Zomig. *Id.* at ¶ 40.

On October 31, 2006, plaintiff was seen by Dr. Scott Holmes. *Id.* at ¶ 41. Dr. Holmes stated that he would order another migraine medication "called Ergotamine (A.K.A. and hereinafter referred to as Cafergot"). *Id.* At that time, Dr. Holmes "informed Plaintiff that Regional Medical Officer (RMO), [Haresh] Pandya, denied the request for Cafergot, stating that it does not appear that patient had adequate trial of safer therapeutic options, e.g., INDERAL, ELAVIL, Walking 45 min. dailys [sic], Excedrin migrain [sic], regular ADL, etc." *Id.* Plaintiff stated that he had tried those options and medications and none of them worked. *Id.* at ¶ 42. In addition, plaintiff asked Dr. Holmes to increase the Zomig from six 5 mg pills per month to twelve pills per month. *Id.* at ¶ 120. However, "[a]fter grabbing a pamphlet from his drawer, which he referred to as an internal medication manual, Holmes advised plaintiff that he could not increase the medication." *Id.* at ¶ 120. Plaintiff informed Dr. Holmes that he (Holmes) prescribed another prisoner twelve 5 mg Zomig pills a month. *Id.*

On November 13, 2006, Dr. Holmes diagnosed plaintiff with migraines and prescribed Inderal ("a blood pressure medication"). *Id.* at ¶ 43. Plaintiff alleged that he attempted to visit IBC HCS twelve times between November 18th and December 9th to have his symptoms documented. *Id.* at ¶ 45. Nine of his attempted visits were refused and "most" of his attempts to visit "were never recorded by IBC HCS." *Id.* at ¶¶ 45-46. When plaintiff was allowed to visit he was told that he had sinus problems, not migraines; allergy problems; and taught how to perform Yoga. *Id.* at ¶ 46. Eventually, IBC HCS advised plaintiff that they did not have to see him every time he had a headache and advised him to keep a log of the headaches to assist the treating physician. *Id.* at ¶ 48.

Plaintiff met with Dr. Holmes on December 11, 2006, and asked the doctor to appeal Dr. Pandya's refusal to increase the Zomig prescription. *Id.* at ¶ 50. Dr. Holmes advised plaintiff that it was not Dr. Pandya, but the manufacturer of Zomig who stated that patients cannot receive more than six pills per month. *Id.* The doctor suggested that plaintiff needs to split the pills in half or save the Zomig for the six most severe headaches and "live life through the bad ones." *Id.*[3]

Plaintiff met with Dr. Holmes for the last time on January 10, 2007, at which time Holmes advised that Dr. Pandya would not authorize Cafergot because prisoners can no longer receive the medication. *Id.* at ¶ 51. Dr. Holmes advised that there was nothing he could for plaintiff, because the medication had been taken out the MDOC budget along with a list of other medications. *Id.* Dr. Holmes prescribed plaintiff Dilantin ("an anti-seizure medication apparently used for headaches"). *Id.* On February 13th, N.P. Hammond advised plaintiff that nothing more could be

---

[3] Plaintiff repeats similar allegations in ¶ 124, but he ascribes the date of the examination as December 2, 2006 rather than December 11, 2006.

done for him and that the issue of inadequate Zomig pills needed to be brought to the attention of Dr. Pandya. *Id.* at ¶ 52.

On February 15, 2007, plaintiff was transferred from IBC to Southern Michigan Correctional Facility (JMF). *Id.* at ¶ 53. During his first week at JMF, plaintiff learned that another prisoner was receiving Cafergot for his "headaches of unknown origin" and that, unlike plaintiff's situation at IBC, the HCS at Saginaw Correctional Facility had granted that prisoner's initial request to have a CT scan. *Id.* at ¶ 127. On February 26th, Dr. Komjathy reviewed plaintiff's file, scheduled him for blood work, and increased his Zomig prescription to 18 5 mg pills per month. *Id.* at ¶ 54. Plaintiff alleged that Dr. Komjathy stated that people suffering from headaches often take 5 mg of Zomig a day to relieve their headaches, and then referenced his Palm Pilot to advise plaintiff of the price for Zomig, which he stated was "high" ($83.00 for a box of six 5 mg pills). *Id.* at ¶ 128. The doctor further advised plaintiff "that headaches were nothing to mess around with because such headaches could be the sign of a serious underlying problem, e.g., a tumor or blood clot." *Id.* at ¶ 129.

On April 4, 2007, plaintiff visited with P.A. Sainz, who requested CMS to approve a CT scan of plaintiff's head due to repeated headaches. *Id.* at ¶ 56. P.A. Sainz informed plaintiff that CMS required him to see an optometrist for an eye examination to rule out eye strain as the problem. *Id.* An eye doctor examined plaintiff on April 9th and found no problems. *Id.* at ¶ 57. Plaintiff also alleged that he underwent an eye examination on April 13th, which resulted in the MDOC providing plaintiff with a pair of eye glasses due to his prescription change. *Id.* at ¶ 80.

On April 16, 2007, plaintiff was transferred to the Kinross Correctional Facility (KCF). *Id.* at ¶ 58. Plaintiff had a CT scan on May 1, 2007. *Id.* at ¶ 59. Plaintiff met with Dr.

Scarff on June 1st, who examined plaintiff and asked what he wanted the medical services to do for him. *Id.* at ¶ 60. Plaintiff stated that he has headaches which begin as pressure in his nose, "is bedridden without adequate medication," and wants to see an ear, nose and throat specialist (ENT). *Id.* The doctor felt that plaintiff should have a neurology consult and was going to ask CMS to approve a consult. *Id.* Dr. Scarff prescribed Cafergot and told plaintiff to report to health care when he had a headache to see if the headaches are blood pressure related. *Id.* at ¶ 61. In addition, the doctor advised plaintiff that he had received a memo from Chief Medical Officer, Dr. Pramstaller, informing him that plaintiff was suspected of abusing the use of Zomig. *Id.* at ¶ 131.

On June 9, 2007, plaintiff was informed that his prescription for Zomig could not be increased. *Id.* at ¶ 62. Plaintiff kited Dr. Scarff on June 11th complaining of inadequate medication and visited the KCF HCS the next day due to a severe headache. *Id.* at ¶¶ 63-64. On June 26th, plaintiff reported to Dr. Scarff that the Cafergot pills "work a little" but did not relieve the pressure in his nose. *Id.* at ¶ 65. Dr. Scarff noted that these headaches did not appear to be migraines, and that he would consider requesting a neurology consult. *Id.*

On July 2, 2007, plaintiff was sent to KCF HCS by his supervisor, librarian Herbig, due to a severe headache which started on July 1st. *Id.* at ¶ 66. Plaintiff advised R.N. Manzardo "that his pain started in his left maxillary sinus." *Id.* Manzardo did not administer any treatment. *Id.* On July 3rd, plaintiff was again sent to KCF HCS due to the earlier headache, and complained of severe pain in maxillary sinuses. *Id.* at ¶ 67. R.N. Sizer noted that plaintiff's nasal passages were red and swollen, but no treatment was administered. *Id.* On July 13th, plaintiff saw Dr. Scarff, who then felt that the problem was not neurological, but related to the sinuses, and submitted a request

for an ENT consult. *Id.* at ¶ 68. CMS employee Dr. DeMasi denied the request for an ENT, because the appropriate medical screening had not been met. *Id.* at ¶ 69.

On July 31, 2007, plaintiff's supervisor sent him to HCS due to a severe headache. *Id.* at ¶ 70. Upon plaintiff's arrival, a nurse noted that his nasal passages were swollen, but gave him no treatment. *Id.* Dr. Scarff advised plaintiff that the ENT consult was denied and that plaintiff should undergo another x-ray of his sinus cavity. *Id.* at ¶ 71. The x-rays, performed on August 9th, revealed no pathology. *Id.* at ¶ 72.

Sometime in July 2007, plaintiff's supervisor called Pharmacy Assistant Ayers regarding the "depletion of his headache medications." *Id.* at ¶ 143. Ms. Ayers "repeatedly told [plaintiff's supervisor] that [p]laintiff cannot receive a refill of his medication, despite the fact that he was currently without any medication, and thus suffering." *Id.*

On August 15 and 30, 2007, plaintiff's supervisor sent him to health care to treat a headache. *Id.* at ¶¶ 73-74. Plaintiff was out of Zomig, informed HCS that the pain started in his left nostril, but received no treatment on both occasions. *Id.* On September 6th, Dr. Scarff said he would request a neurology consult, but also told plaintiff that he may have nasal polyps in the left nostril. *Id.* at ¶ 75. CMS denied the request for a neurologist, requiring another eye evaluation to rule out eye strain as a cause of the headaches. *Id.* at ¶¶ 76-77. Plaintiff stated that he had seen an eye doctor twice for the problem in the last 2 1/2 years "and that the last eye doctor visit was as recent as March 2007 at JMF." *Id.* at ¶ 79. Plaintiff was advised to see the eye doctor to get a pair of glasses which met policy standards, wear the glasses for a while, and that he would be reassessed if he continued to have problems. *Id.* An eye doctor examined plaintiff on October 22nd and concluded that eye strain was not the cause of his headaches. *Id.* at ¶ 84.

On November 1, 2007, plaintiff kited Dr. Scarff to request neurology and ENT consults. *Id.* at ¶ 86. On November 26th, plaintiff's supervisor contacted KCF HCS regarding plaintiff's headache. *Id.* at ¶ 87. The nurse noted that plaintiff had "an ear bubble congestion in his right ear, and that his sinuses were swollen," but administered no treatment. *Id.* Petitioner kited Dr. Scarff on November 29th to request a neurologist and ENT consult. *Id.* at ¶ 88. On December 19, 2007, plaintiff kited Dr. Scarff accusing him of ignoring his request to treat his daily headaches "of unknown origin," allowing him to run out of medication every month and not requesting a specialist. *Id.* at ¶ 89.

On January 24, 2008, Dr. Scarff placed another request for a neurology consult, which was approved. *Id.* at ¶¶ 90-91. The neurologist (Dr. Sweeney) examined plaintiff on March 26th and ordered an MRI, which took place on April 21st. *Id.* at ¶¶ 92-93. On May 5th, Dr. Scarff informed plaintiff that the MRI ruled out any neurological problem, but indicated a sinus infection. *Id.* at ¶ 94. The doctor prescribed plaintiff an antibiotic, but refused plaintiff's request to see an ENT. *Id.* On May 22nd, Dr. Sweeney reviewed the MRI with plaintiff, stated that she saw no neurological problems, but noted an infection in plaintiff's left maxillary sinus cavity. *Id.* at ¶ 95.

Plaintiff saw a "fill in" doctor at KCF on July 7, 2008, who examined him and noted that he may suffer from a nasal polyp in the left maxillary sinus, which may be the cause of his headaches. *Id.* at ¶ 96. The doctor stated that he would schedule an appointment with an ENT. *Id.* at ¶ 89.[4] On September 15th, plaintiff met with Dr. Dunsmeath at KCF, who concluded that plaintiff's sinuses are severely allergic and inflamed, and then developed nasal polyps which are

---

[4] In a typographical error, plaintiff inserted ¶ 89 after ¶ 96. *See* Compl. at p. 18.

causing plaintiff's headaches. *Id.* at ¶ 97. Dr. Dunsmeath prescribed an antibiotic and nasal spray and requested an off-site consultation with an ENT. *Id.* at ¶ 98.

On October 1, 2008, plaintiff was transferred to the Mound Correctional Facility (NRF). *Id.* at ¶ 99. On October 4th, plaintiff kited the NRF HCS for a diagnosis or treatment of his headaches and nasal polyps. *Id.* Plaintiff met with Dr. Vadlamudi on October 23rd, at which time the doctor ordered x-rays of his nasal passages and wrote him a prescription for a nasal spray. *Id.* at ¶ 100. The doctor advised plaintiff that if he were out in the world he could see an ENT, "but since he is in here it is not really an option." *Id.* at ¶ 142.

On November 26, 2008, plaintiff was transferred back to KCF. *Id.* at ¶ 101. Plaintiff kited the KCF HCS to see a doctor for a follow-up visit on his headaches. *Id.* On December 2nd, R.N. Manzardo refused to schedule plaintiff for a follow-up visit with a doctor, informing him that he can only see the doctor every six months for a neurological evaluation. *Id.* at ¶ 102.

On January 5, 2009 a nurse at KCF HCS informed plaintiff that he would have to undergo the x-rays (his third set) before being allowed to see a doctor. *Id.* at ¶ 104. Plaintiff had x-rays taken of his nasal passages on January 12th. *Id.* at ¶ 105. On January 15th, plaintiff's supervisor called R.N. Manzardo to see if he would give plaintiff his Zomig prescription one day early (the medication was to be dispensed at the KCF pharmacy on January 16, 2009). *Id.* at ¶ 146. R.N. Manzardo told plaintiff he could not have the medication until the dispensing date, no exceptions, and then told him to come to HCS to have his sinuses and headache examined. *Id.* R.N. Manzardo then "pawned" plaintiff off onto another nurse (Nurse Christina), who "scolded" plaintiff for having his supervisor call healthcare and told him to "stop whining to staff" to go to healthcare.

*Id.* Nurse Christine refused to evaluate plaintiff because he did not have a life threatening problem, and told him to "put in a kite like everyone else." *Id.*

Plaintiff met with KCF physician Dr. Piazza on January 29th, who examined plaintiff and prescribed an antibiotic for the sinus infection, prescribed an anti-inflammatory medication for the swelling and headaches, ordered plaintiff to undergo "blood/lab work," requested CMS to approve an ENT consult, and increased plaintiff's Zomig prescription from six 5 mg pills per month to nine pills per month. *Id.* at ¶ 106.

On or about February 1, 2009, CMS granted the request for an off-site ENT consult. *Id.* at ¶ 107. On February 17th, plaintiff was examined by Dr. Slater, an ENT, who diagnosed plaintiff as having a septal spur and deviated septum, recommended a CT scan of the sinuses and possible surgery, and requested a follow-up visit within two weeks of the CT scan. *Id.* at ¶ 108.

On March 10, 2009, plaintiff's prescription for Cafergot was discontinued and he was advised that Cafergot and Zomig are not to be taken together. *Id.* at ¶ 110. Plaintiff underwent a CT scan of his sinus cavity on March 17th. *Id.* at ¶ 111. Plaintiff alleged that he was scheduled to see Dr. Piazza on April 22nd and that he was not called out on that date. *Id.* at ¶ 113. Plaintiff kited HCS on April 22nd requesting a doctor visit, and R.N. Sizer advised him that he was on call to see the doctor on either April 23rd or April 24th. *Id.* at ¶ 114. Plaintiff was informed on April 29th by a nurse at KCF HCS that he remains on the waiting list to see the doctor. *Id.* at ¶¶ 115-16. Plaintiff alleged that from May 3rd through 5th he was bedridden and had his family telephone KCF to address his medical needs, including medication, an appointment with a KCF doctor, and a follow-up appointment with Dr. Slater to allow him an opportunity to perform surgery on plaintiff's

sinuses. *Id.* at ¶ 158. Plaintiff's father contacted the MDOC's Regional Healthcare Administrator in May 2009, which resulted in the Cafergot being re-issued to plaintiff on May 12th. *Id.* at ¶ 161.

Plaintiff alleges that defendants were negligent and violated his Eighth Amendment rights for delaying treatment and failing to provide him with the medical treatment he feels is adequate for his headaches. Plaintiff seeks money damages and injunctive relief.[5]

## II.     Defendants' motion to dismiss (docket no. 46)

### A.     Legal Standard

Defendants CMS, Dr. DeMasi, N.P. Hammond and Dr. Holmes seek to dismiss plaintiff's action pursuant to Fed. R. Civ. P. 12(b)(6) on various grounds.

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (internal citations omitted). In making this determination, the complaint must be construed in the light most favorable to the plaintiff, and its well-pleaded facts must be accepted as true. *Morgan v. Churchs Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the

---

[5] The court notes that defendant Dr. Scarff died before plaintiff filed this action. A report recommending dismissal of this defendant is pending. *See* docket no. 102.

Complaint and are central to the claims contained therein." *Bassett v. National Collegiate Athletic Association*, 528 F.3d 426, 430 (6th Cir. 2008).

### B. Failure to exhaust

### 1. Exhaustion requirement

The Prison Litigation Reform Act ("PLRA") 42 U.S.C. § 1997e, provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones v. Bock*, 549 U.S. 199, 218 (2007); *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' " *Jones*, 549 U.S. at 218.

Defendants CMS, Dr. DeMasi, N.P. Hammond and Dr. Holmes have moved to dismiss this action for lack of exhaustion. "[A] prisoner's failure to exhaust under § 1997e(a) is an affirmative defense on which the defendant bears the burden of proof." *Vandiver v. Correctional Medical Services, Inc.*, 326 Fed. Appx. 885, 888 (6th Cir. 2009), citing *Jones*, 549 U.S. at 217-220. A defendant can raise affirmative defenses in a motion to dismiss. *See, e.g., Jackson v. Schultz*, 429 F.3d 586, 589 (6th Cir. 2005) (defendant could properly raise the affirmative defense of qualified immunity "based on a pre-answer motion to dismiss"); *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003) ("Like other Rule 12(b)(6)

motions to dismiss, a motion to dismiss on statute of limitations grounds should be granted when the statement of the claim affirmatively shows that the plaintiff can prove no set of facts that would entitle him to relief. A court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice.") (internal quotation marks and citations omitted).

It is appropriate for defendants in a prisoner civil rights action to raise the affirmative defense of failure to exhaust administrative remedies in a motion to dismiss. *Bryant v. Rich*, 530 F.3d 1368, 1374-75 (11th Cir.), cert. denied 129 S. Ct. 733 (2008). "Because exhaustion of administrative remedies is a matter in abatement and not generally an adjudication on the merits, an exhaustion defense [under the PLRA] . . . is not ordinarily the proper subject for a summary judgment; instead, it should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment." *Id.* (internal quotation marks omitted).

The MDOC grievance procedure is an administrative review regulated by the agency's Policy Directives. This court may take judicial notice of plaintiff's grievance filings in this state agency proceeding for purposes of deciding a motion to dismiss. *See Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) (a court may consider public records without converting a Rule 12(b)(6) motion into a Rule 56 motion, but may only take judicial notice of facts which are not subject to reasonable dispute); *Marshek v. Eichenlaub*, No. 07-1246, 2008 WL 227333 at *1 (6th Cir. Jan. 25, 2008) (court can take judicial notice of prisoner's transfer as shown in the Bureau of Prison's Inmate locator accessed on the agency's official website); *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2nd Cir. 1991) ("[w]here plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing

the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated"); *Walker v. Woodford*, 454 F.Supp.2d 1007, 1021-23 (S.D.Cal. 2006) (the Court may consider a limited set of documents without converting a Rule 12(b)(6) motion into a motion for summary judgment, including matters that can be judicially noticed; documents pertaining to the prisoner's exhaustion efforts "are part of a state administrative proceeding and may be judicially noticed, not for the truth of their contents but for the fact that the grievance proceeding occurred"); *Eggerson v. United States*, 1: 05-cv-594, 2006 WL 1720252 at *3 (W.D. Mich. June 22, 2006) ("In ruling on a motion under Rule 12(b)(6), the court may supplement the facts alleged in the pleadings by considering facts susceptible to judicial notice under Fed.R.Evid. 201"); *Walker v. Abdellatif*, No. 1:07-cv-1267, 2009 WL 579394 (W.D. Mich. March 5, 2009) (taking judicial notice of MDOC prisoner grievance proceedings in deciding motion to dismiss for lack of exhaustion); *White v. Correctional Medical Services, Inc.*, No. 1:08-cv-277, 2009 WL 596473 (W. D. Mich. March 6, 2009) (same).

Taking judicial notice of a prisoner's administrative grievance proceeding is consistent with the purpose of the PLRA's "invigorated" exhaustion provision, which Congress enacted to control the "sharp rise in prisoner litigation in the federal courts." *Woodford*, 548 U.S. at 84. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones*, 549 U.S. at 204.

## 2.  MDOC grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130.[6]  A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control.  If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff.  The Policy Directive provides the following directions for completing grievance forms:

> The issues shall be stated briefly but concisely.  Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how).  Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original).[7]  The prisoner must send the Step I grievance to the appropriate grievance coordinator.  If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator.  Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the appropriate MDOC official.

## 3.  Plaintiff's grievances pursued through Step III

---

[6] Plaintiff filed grievances from October 2006 through November 2008.  Three different versions of this policy directive applied during the course of that treatment with effective dates as follows: December 19, 2003; March 5, 2007; and July 9, 2007.  While the lettering of the paragraphs in the three versions is not identical, and slight variations occur, each of the policy directives contain the basic requirements outlined in this report.

[7] The quoted section, which appears in the July 9, 2007 version of the policy directive is nearly identical to the previous versions; the differences between the versions are of no significance for the purpose of this report.

The record reflects that plaintiff filed seven grievances exhausted through Step III while incarcerated at IBC, KCF and NRF.

### a. Grievance IBC 2006-11-3497-12D3

Grievance IBC 2006-11-3497-12D3 ("3497"), bearing an incident date of October 31, 2006, states that Dr. Holmes would not examine him on that date and the N.P.Hammond had failed to treat his migraines over the past year. *See* docket no. 46-6. Plaintiff claims that he has had 152 migraine headaches since January 1, 2006 and that Dr. Holmes and N.P. Hammond denied his request for a specialist.

### b. Grievance IBC-2006-12-4126-28a

Grievance IBC-2006-12-4126-28a ("4126"), bearing an incident date of December 22, 2006, claims that Dr. Pandya has been deliberately indifferent because he refused to increase plaintiff's prescription for Zomig from 6 to 12 pills per month. *See* docket no. 46-7. This grievance was rejected, because plaintiff raised the same issues in IBC-06-3497-12D3.

### c. Grievance KCF-2007-05-717-17a

Grievance KCF-2007-05-717-17a ("717"), bearing an incident date of May 8, 2007, is directed against non-party RUM Malette for claiming that plaintiff was "suspected of running drugs" at RCF. *See* docket no. 46-8. This grievance is unrelated to the present cause of action.

### d. Grievance KCF-2007-10-1359-12D3

KCF-2007-10-1359-12D3 ("1359"), bearing an incident date of September 25, 2007, is directed at CMS, CMS employee "John Doe," and Dr. Scarff. *See* docket no. 46-9. The grievance involves CMS' rejection of Dr. Scarff's request that plaintiff be referred to an ear, nose and throat specialist (ENT) and a neurologist.

### e.  Grievance KCF-2007-10-1466-12f

Grievance KCF-2007-10-1466-12f ("1466"), bearing an incident date of October 24, 2007, is directed at Dr. Scarff for rejecting plaintiff's request to increase the Zomig from 6 pills to 12 pills per month.  *See* docket no. 46-10.

### f.  Grievance KCF-2008-09-1149-12f

Grievance KCF-2008-09-1149-12f ("1149"), bearing an incident date of September 24, 2008, is directed against R.N. Manzardo, R.N. Sizer, R.N. Jenkins, R.N. Hall, and "pharmacy personnel  Shannon and Jane Doe."  *See* docket no. 46-11.  In this grievance, plaintiff claims that staff were not providing him with medical care because he ran out of medication (Zomig and Cafergot) and pharmacy staff would not give him more.

### g.  Grievance NRF-2008-11-612-12d

Grievance NRF-2008-11-612-12d ("612"), bearing an incident date of November 3, 2008, is directed at "Dr. Seethe Jadlamudi" (i.e., Dr. Seetha Vadlamudi) regarding plaintiff's initial examination by the doctor, and the doctor's refusal to arrange a consultation with an ENT.

### 4.  Dr. DeMasi

The record reflects that plaintiff did not file any grievances against Dr. DeMasi. Plaintiff has failed to properly exhaust a grievance against this defendant as required by the PLRA. *See Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93; *Sullivan v. Kasajaru*, 316 Fed. Appx. 469, 470 (6th Cir. 2009) (affirming dismissal for lack of exhaustion where prisoner failed follow requirements of Policy Directive 03.02.130, which explicitly required him to name each person against whom he grieved, citing *Jones* and *Woodford*).  Accordingly, Dr. DeMasi is entitled to dismissal on this basis.

### 5.    Dr. Holmes

Plaintiff has alleged five "causes of action" against Dr. Holmes. Each "cause of action" alleged against Dr. Holmes (and the other defendants) includes three separate claims: a claim for negligence; a claim for "intentional delay and delay of access to medical care;" and a claim for deliberate indifference to his serious medical needs in violation of the Eighth Amendment.[8] Plaintiff's claims for deliberate indifference and delay of access to medical care arise under the Eighth Amendment. *See LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001) ("many federal courts have recognized, a deliberately indifferent delay in giving or obtaining treatment may also amount to a violation under the Eighth Amendment"). Plaintiff's claim for negligence is a state law claim. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation).

The First Cause of action alleged that the doctor refused to refer him to a specialist or order a CT scan. Compl. at ¶¶ 162-63. The Second cause of action alleged that the doctor refused to acquiesce in plaintiff's "many requests" for adequate or alternative medications. *Id.* at ¶¶ 164-65. The Third cause of action alleged that the doctor "refused to physically examine [p]laintiff during any visit with him." *Id.* at ¶¶ 166-67. The Fourth cause of action alleged that the doctor failed to adequately treat plaintiff within a reasonable amount of time. *Id.* at ¶¶ 168-69. Finally, the Fifth cause of action alleged that the doctor refused to prescribe an additional medication (Cafergot).

The only grievance naming Dr. Holmes is no. 3497, in which plaintiff complains: that Dr. Holmes did not examine him even though this was his first visit with the doctor; that the doctor

---

[8] Plaintiff's 230-paragraph complaint involves 28 "causes of action" containing 84 claims. The fact that this pleading monstrosity has survived initial screening, suggests that *pro se* prisoner complaints are effectively exempt from Fed. R. Civ. P. 8(a)(2), which states that a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

did not believe that plaintiff suffered from migraines; that the doctor denied plaintiff's request to see a specialist; that the doctor would order another migraine medication Ergotamine (a component of Cafergot); and that the doctor would not prescribe 6 to 12 Zomig pills per month, but he would "look into" increasing plaintiff's Zomig prescription. *See* docket no. 46-6. In addition, plaintiff requested a CT scan and MRI. *Id.* The grievance, dated November 3, 2006, stated that the requested increase for Zomig was denied on that date. *Id.* In this regard, the Step I response states that the requested dosage exceeds the monthly recommended dosage of Zomig. *Id.*

Plaintiff exhausted the five causes of action against Dr. Holmes with respect to the October 31, 2006 visit. However, plaintiff has not exhausted these claims with respect to the doctor's conduct after that date. Accordingly, Dr. Holmes' motion should be denied as to plaintiff's claims related to the October 31, 2006 visit and granted as to visits occurring after that date.

### 6. N.P. Hammond

Plaintiff's complaint alleged that he saw N.P. Hammond on March 16, June 2, July 31, October 6, 2006. Compl. at ¶¶ 33, 35, 36 and 119. In addition, plaintiff alleged that he kited the nurse practitioner on July 14, October 15 and October 16, 2006. *Id.* at ¶¶ 34, 37 and 39. Plaintiff has alleged four causes of action against N.P. Hammond. The Sixth cause of action alleged that the nurse practitioner refused to refer him to a specialist or order a CAT scan. Compl. at ¶¶ 172-73. The Seventh cause of action alleged that the nurse practitioner acquiesced in plaintiff's "many requests" for adequate or alternative medications. *Id.* at ¶¶ 174-75. The Eighth cause of action alleged that the nurse practitioner "refused to physically examine [p]laintiff during any visit with him." *Id.* at ¶¶ 176-77. Finally, the Ninth cause of action alleged that the nurse practitioner failed to adequately treat plaintiff within a reasonable amount of time. *Id.* at ¶¶ 178-79.

N.P. Hammond, like Dr. Holmes, is only named in grievance no. 3497, in which plaintiff claimed: that he had been treated by the nurse practitioner in the past year; that she has not been able to make a diagnosis; that she has prescribed a vast variety of medications that had very little or no results; and that she denied his requests to see a specialist as well as have an MRI and CT scan. Plaintiff exhausted these four claims against N.P. Hammond with respect to conduct that occurred before the incident date of October 31, 2006. Accordingly, N.P. Hammond's motion should be denied as to plaintiff's claims that occurred on or before October 31, 2006, and granted as to claims that occurred after that date.

### 7. CMS

Plaintiff has alleged two causes of action against CMS. The Seventeenth cause of action alleged that CMS refused to grant Dr. Scarff's request for an ENT and neurology consult. Compl. at ¶¶ 193-94. The Eighteenth cause of action alleged that CMS required plaintiff to undergo an eye examination to determine whether eye strain was the cause of plaintiff's daily headaches, despite the fact that plaintiff had seen an eye doctor twice within the past 2 1/2 years. *Id.* at ¶¶ 195-96. The only grievance naming CMS is no. 1359, bearing an incident date of September 25, 2007. The grievance involves CMS' rejection of Dr. Scarff's request that plaintiff be referred to an ENT and a neurologist.

Plaintiff has exhausted his Seventeenth cause of action against CMS with respect to the rejection of Dr. Scarff's request for referral to an ENT and a neurologist. However, there was no grievance filed with respect to plaintiff's Eighteenth cause of action regarding the eye examination which, according to plaintiff's complaint, occurred on January 24, 2008. Accordingly,

CMS' motion should be denied as to plaintiff's claim regarding referral to an ENT and granted as to plaintiff's claim regarding the eye examination.

### 8.     Summary of exhaustion

In summary, the following "causes of action" are exhausted: Dr. Holmes (First, Second, Third, Fourth and Fifth, as to acts that occurred on October 31, 2006); N.P. Hammond (Sixth, Seventh, Eighth and Ninth, as to acts that occurred on or before October 31, 2006); and, CMS (Seventeenth).

### C.     Failure to state an Eighth Amendment claim

### 1.     Legal standard

It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer*, 511 U.S. at 834. A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Hudson*, 503 U.S. at 8-9. With respect to the infliction of serious pain, courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.*

at 8 (internal citations and quotation marks omitted).  Similarly, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.*  at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety.  *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991).  To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

### 2.        Plaintiff's claim against CMS

Plaintiff's complaint fails to "state a claim to relief that is plausible on its face" against CMS.  *Iqbal*, 129 S. Ct. at 1949.  It is well established that "[a] defendant cannot be held liable under section 1983 on a respondeat superior or vicarious liability basis." *Street v. Corrections Corporation of America*,  102 F.3d 810, 818 (6th Cir. 1996), citing *Monell v. New York City Department of Social Services*, 436 U.S. 658  (1978).   A plaintiff who sues a private or public corporation for constitutional violations under 42 U.S.C. § 1983 must establish that a policy or custom caused the alleged injury.  *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998); *Street*,  102 F.3d at 818.  The Sixth Circuit has held that like a municipal corporation, "CMS's liability must also be premised on some policy that caused a deprivation of [a prisoner's] Eighth Amendment rights." *Starcher v. Correctional Medical Systems, Inc.*, 7 Fed. Appx. 459, 465 (6th Cir.

2001).  Thus, in order to state a § 1983 claim against CMS, plaintiff "must allege the existence of a policy, practice or custom that resulted in the injury."  *Moreno v. Metropolitan General Hosp.*, No. 99-5205, 2000 WL 353537 at *2 (6th Cir.  March 28, 2000).  "It is not enough for a complaint under § 1983 to contain mere conclusory allegations of unconstitutional conduct by persons acting under color of state law.  Some factual basis for such claims must be set forth in the pleadings."  *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986).  *See Bartalone v. Berrien County*, 643 F. Supp. 574, 578-79 (W.D. Mich. 1986) (a plaintiff in a § 1983 action "must allege sufficient facts to establish the probable existence of the pattern, custom, or policy of which  [he] complains.").  Such allegations typically include one or more of the following: the corporation's official policies; actions taken by officials with final-decision making authority; a policy of inadequate training or supervision; or a custom of tolerance or acquiescence of federal rights violations.  *See, e.g., Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (listing "four avenues" a plaintiff may take to prove the existence of a municipality's illegal policy or custom).

Here, plaintiff alleged that CMS did not grant Dr. Scarff's request for an ENT and neurology consultation.  *See* Compl. at ¶¶ 134, 193-94.  Plaintiff has not alleged sufficient factual matters to establish the probable existence of a CMS policy that violates the Eighth Amendment.  For this reason, his complaint should be dismissed.  Furthermore, even if plaintiff had alleged such a policy, he has not alleged deliberate indifference.  At most, plaintiff has alleged a disagreement between himself, medical staff and CMS regarding the proper treatment for his chronic headaches.  The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate  medical treatment."  *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976).  This  action falls in the latter

category. "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id. See Owens v. Hutchinson*, 79 Fed. Appx. 159, 161 (6th Cir. 2003) ("[a] patient's disagreement with his physicians over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable as a federal constitutional claim"). Accordingly, the court should grant CMS' motion to dismiss.

### 2.    Chronic headaches as an objective component

Defendants contend that there is no objective component in this action, because plaintiff's alleged chronic headaches do not constitute a serious medical need sufficient to support an Eighth Amendment claim. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson*, 503 U.S. at 9. Because an inmate relies on prison authorities to treat his medical needs, deliberate indifference to those needs is cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Conditions which deprive inmates of the "minimal civilized measure of life's necessities" could be cruel and unusual. *Id.*

Defendants assert that plaintiff's condition is not a serious medical need beause it fails to meet the "obviousness" rule as set forth in *Blackmore v. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004). In *Blackmore*, the Sixth Circuit stated a medical need is objectively serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore*, 390 F.3d at 897 (internal citations omitted). However, this is only one "branch" of the Eighth

Amendment. *See id.* at 897-98. A "separate branch" of the Eighth Amendment deals with the delay in treatment, such as claims that the defendants delayed administration of medication, that the defendants determined that medical treatment was unnecessary and that the defendants did not treat the prisoner adequately. *Id.* at 897-98. The court agrees with defendants that a headache is a normal occurrence for all persons, which is not so obvious that a doctor would prescribe treatment or a lay person would recognize the obvious need for treatment. However, in this case, plaintiff has not merely alleged "a headache." Rather, plaintiff has alleged daily chronic migraine headaches, which have lasted over one year, which are being treated by prescription medication, and which have been subject to various tests to determine the source of the headaches. Under these circumstances, the court concludes that plaintiff's chronic headaches constitute a serious medical need under the Eighth Amendment. Accordingly, plaintiff's complaint has alleged the objective component of an Eighth Amendment claim.

### 3. Dr. Holmes

As previously discussed, the only exhausted claims against Dr. Holmes involve matters that arose from the October 31, 2006 examination. Of these claims, plaintiff's First, Second, and Fifth causes of action fail to state an Eighth Amendment claim, because they each involve a disagreement between plaintiff and the doctor regarding medical treatment (i.e., the doctor's failure to refer plaintiff to a specialist, to order a particular test, or to order a particular type of medication). Compl. at ¶¶ 162-64, 168-69. Because plaintiff has received some treatment, and his dispute is over the adequacy of the treatment, his claim sounds in state tort law rather than as a federal constitutional claim. *Westlake*, 537 F.2d at 860 n. 5; *Owens*, 79 Fed. Appx. at 161. In addition, plaintiff's Third and Fourth causes of action also fail to state an Eighth Amendment claim. Plaintiff

alleged that he met with Dr. Holmes and that, after a review of his condition, the doctor stated that plaintiff could not have an increased dosage of Zomig, but that he would prescribe an alternative medication. In addition, plaintiff has not alleged that Dr. Holmes refused to treat him in a reasonable amount of time. *See* Compl. at ¶¶ 166-69. Thus, Dr. Holmes' motion to dismiss for failure to state a claim should be granted as to the Eighth Amendment claims alleged in the First, Second, Third, Fourth and Fifth causes of action.

### b.      N.P. Hammond

Plaintiff has exhausted his four causes of action against N.P. Hammond, all of which occurred on or before October 31, 2006. Plaintiff's Sixth and Seventh causes of action, in which plaintiff alleged that N.P. Hammond failed to refer him to a specialist, order a CT scan or provide different medications, do not state causes of action. *Id.* at ¶¶ 172-75. These allegations disputing the adequacy of the medical treatment sound in state tort law rather than as a federal constitutional claim. *Westlake*, 537 F.2d at 860 n. 5; *Owens*, 79 Fed. Appx. at 161. Furthermore, plaintiff's Eighth and Ninth causes of action do not state an Eighth Amendment claim that that N.P. Hammond refused to examine plaintiff and failed to treat him within a reasonable amount of time prior to October 31, 2006. *See* Compl. at ¶¶ 176-79. As discussed in § I, plaintiff alleged that he saw N.P. Hammond on only a few occasions and that she agreed to a treatment plan and to increase his Zomig dosage. N.P. Hammond's motion to dismiss should be granted as to the Sixth, Seventh, Eighth and Ninth causes of action.

### D. Statute of limitations

The statute of limitations for a § 1983 claim in Michigan is three years, based upon Michigan's three-year statute of limitations for injury to a person or property, M.C.L. § 600.5805(10). *Chippewa Trading Company v. Cox*, 365 F.3d 538, 543 (6th Cir. 2004). Defendants point out that some of plaintiff's allegations against N.P. Hammond involve events that occurred before he filed this action on May 27, 2009. Specifically, plaintiff seeks relief against N.P. Hammond for actions that occurred on March 16, 2006. Compl. at ¶ 117. This claim is untimely, and Hammond is entitled to dismissal of plaintiff's claims arising from the March 16, 2006 incident.

### E. Plaintiff's claims for injunctive relief

Plaintiff alleged that he received treatment from Dr. Holmes and N.P. Hammond at IBC and that he was transferred from that facility to the Southern Michigan Correctional Facility on February 15, 2007. Compl. at ¶ 53. Dr. Holmes and N.P. Hammond seek dismissal of plaintiff's claim for injunctive relief because plaintiff is no longer incarcerated at IBC. There is no allegation that either Dr. Holmes or N.P. Hammond treated plaintiff after his transfer from IBC. The record reflects that plaintiff was incarcerated at the KCF when he filed this action and that he is currently at that facility. Plaintiff's transfer from IBC renders his claims for injunctive relief against Dr. Holmes and N.P. Hammond moot. *See Henderson v.* Martin, 73 Fed. Appx. 115, 117 (6th Cir. 2003) (prisoner's claim for injunctive relief against prison officials became moot when prisoner was transferred from the prison of which he complained to a different facility); *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996) (prisoner's claims for declaratory and injunctive relief for prison staff's improper examination of his legal mail found moot because he was no longer confined at the facility

that searched his mail). Finally, CMS has advised the court that it is no longer under contract with the MDOC. For this reason, plaintiff's claim for injunctive relief against CMS is moot.

Accordingly, Dr. Holmes, N.P. Hammond and CMS are entitled to dismissal of plaintiff's claim for injunctive relief.[9]

### F. Summary of rulings on defendants' motion to dismiss for failure to state a claim and on the statute of limitations defense

In summary, all of plaintiff's claims against Dr. DeMasi should be dismissed for lack of exhaustion and all of plaintiff's Eighth Amendment claims against Dr. Holmes, N.P. Hammond and CMS should be dismissed for failure to state a claim. The only claims that remain against Dr. Holmes, N.P. Hammond and CMS are the "causes of action" alleging negligence under state law.

## III. Defendants' motion for summary judgment (docket no. 36)

### A. Legal Standard

Dr. Vadlamudi, Dr. Pandya, R.N. Mazardo, R.N. Sizer, and Pharmacy Assistant Ayers (collectively referred to as the "MDOC defendants") have moved for summary judgment on various grounds. Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present

---

[9] It is unnecessary for the court to address Dr. DeMasi's motion to dismiss claims for injunctive relief, because plaintiff has failed to exhaust any claims against him.

significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B.    Personal involvement of Dr. Pandya and Ms. Ayers

Dr. Pandya and Ms. Ayers seek summary judgment on the ground that they had no personal involvement in plaintiff's medical care. It is well settled that a § 1983 action cannot be based on a theory of respondeat superior. *See Monell*, 436 U.S. at 691; *Taylor v. Michigan Department. of Corrections*, 69 F.3d 76, 80-81 (6th Cir. 1995). A supervisor's liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act. *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998). In order to hold a supervisor liable under § 1983, "[t]here must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 129 S. Ct. at 1948.

### 1.    Dr. Pandya

In his Tenth cause of action, plaintiff alleged that Dr. Pandya refused to provide him with "adequate and/or alternative medication(s)" to alleviate his pain.  Compl. at ¶¶ 180-81.  Specifically,  plaintiff alleged that Dr. Pandya denied his request for Caferfot to treat his migraines.  Compl. at ¶¶ 41-42, 120-22.  In his affidavit, Dr. Pandya states that he reviewed an off-formulary request from Dr. Holmes for "ergotamine prn migraine or increase in Zomig" related to plaintiff.  Pandya Aff. at ¶ 5 (docket no. 39-3).  After reviewing plaintiff's medical records, which reflected plaintiff's other medications, and based on his medical judgment, Dr. Pandya denied the request for "ergotamine prn" to treat plaintiff's headaches.  *Id.* at ¶¶ 5-6.  Dr. Pandya also did not approve the request to increase the Zomig pills because a high dosage of this medication was not medically indicated.  *Id.* at ¶ 7.  In addition, Dr. Pandya stated that he was not requested to approve Cafergot for plaintiff, pointing out that Ergotamine is not the same medication as Cafergot (as plaintiff suggests in ¶ 41 of his complaint).  *Id.* at ¶ 9.  Rather, Cafergot contains Ergotamine with caffeine.  *Id.*  Dr. Pandya stated that he had no involvement in the direct care and treatment of plaintiff, with his involvement being only in the capacity as Regional Medical Officer.  *Id.* at ¶ 12.  In the court's opinion, for purposes of plaintiff's Eighth Amendment claim, Dr. Pandya was involved in the direct care and treatment of plaintiff when he rejected the non-formulary requests.  Dr. Pandya's motion should be denied with respect to that particular claim.

### 2.    Ms. Ayers

In his Twenty-Fifth cause of action, plaintiff alleged that Ms. Ayers  refused to grant plaintiff's requests to provide him with "adequate and/or alternative medication(s)" to alleviate his pain.  Compl. at ¶¶ 209-10.  The Twenty-Sixth cause of action alleged that Ms. Ayers refused "to

inform the physician or nurse supervisor that [p]laintiff is routinely sent to healthcare by non-medical staff when [p]laintiff is suffering from a headache without any medication because he runs out each month." *Id.* at ¶¶ 211-12. Plaintiff's only allegation against Ms. Ayers is that she repeatedly told plaintiff's supervisor that he "cannot receive a refill of his medication, despite the fact that he was currently without any medication, and thus suffering." *Id.* In her affidavit, Ms. Ayers states that she is presently the pharmacist assistant at KCF. Ayers Aff. at ¶ 1 (docket no. 39-6). Ms. Ayers further stated that "[a]s a Pharmacist Assistant I do not have authority to dispense medication prior to the date the Physician ordered or to change the quantity of a specific medication ordered." *Id.* at ¶ 3. While Ms. Ayers dispenses prescribed medication to plaintiff, she had no personal involvement in the decision to prescribe the medication. Plaintiff has no basis for a claim against Ms. Ayers for failing to dispense medication that has not been authorized by a physician. Furthermore, Ms. Ayers cannot be vicariously liable for a physician's alleged § 1983 violation for failing to prescribe medication. *See Iqbal*, 129 S. Ct. at 1948. Accordingly, Ms. Ayers is entitled to summary judgment with respect to the Eighth Amendment claim.[10]

### C. Eighth Amendment claims

The MDOC defendants contend that they are not liable for an Eighth Amendment violation because plaintiff's headaches have been monitored and treated by medical providers.

---

[10] In his response, plaintiff has submitted a chart which allegedly shows the late delivery of headache medication. Response at p. 12 (docket no. 80). However, all of the alleged late deliveries occurred after plaintiff signed his complaint on May 20, 2009. In addition, none of the 230 paragraphs within the complaint allege that Ms. Ayers, or anyone else, intentionally delayed dispensing any medication. Accordingly, these allegations, which post-date the complaint, are not before the court and will not be considered.

### 1. Dr. Pandya

As previously discussed, Dr. Pandya denied plaintiff's requests for non-formulary medications based upon his medical judgment. Plaintiff's disagreement with this course of medical treatment does not constitute an Eighth Amendment claim. *See Westlake*, 537 F.2d at 860 n. 5; *Owens*, 79 Fed. Appx. at 161. Even if the doctor's acted negligently in denying the request, mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Farmer*, 511 U.S. at 835. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106. Furthermore, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Accordingly, Dr. Pandya is entitled to summary judgment with respect to plaintiff's Eighth Amendment claim.

### 2. Dr. Vadlamudi

In his Twenty-Seventh cause of action, plaintiff alleged that Dr. Vadlamudi refused to provide him with h "adequate and/or alternative medication(s)" to alleviate his pain. Compl. at ¶¶ 213-14. In addition, the Twenty-Eighth cause of action alleged that the doctor refused to request an ENT for plaintiff. *Id.* at ¶¶ 215-16. Specifically, plaintiff alleged that he visited Dr. Vadlamudi on October 23, 2008, complained of daily headaches and informed the doctor that "according to a September 15, 2008 visit with Dr. Dunseath at KCF, he was supposed to see an ENT specialist to determine the cause of the headaches because no one knows what the cause is." Compl. at ¶ 142. As previously discussed, Dr. Vadlamudi examined plaintiff's nose, said it was red from nasal spray, and ordered x-rays and nasal spray. *Id.* at ¶¶ 100, 142. Dr. Vadlamudi did not submit an affidavit

in support of the motion for summary judgment. Nevertheless, plaintiff's allegations, when viewed in the light most favorable to him, do not rise to the level of an Eighth Amendment claim.

Plaintiff alleged that he was transferred to NRF on October 1, 2008 and that Dr. Vadlamudi examined plaintiff after he kited the healthcare department at NRF for diagnosis and treatment of his headaches and nasal polyps. *Id.* at ¶ 99. Plaintiff has alleged that Dr, Vadlamudi treated him: the doctor examined plaintiff; prescribed medication and ordered x-rays. *Id.* at ¶¶ 100 and142. While plaintiff disagreed with the doctor's course of treatment, his disagreement with that treatment does not establish an Eighth Amendment violation. *See Westlake*, 537 F.2d at 860 n. 5; *Owens*, 79 Fed. Appx. at 161. Even if the doctor acted negligently (a conclusion which this court does not draw from plaintiff's allegation), mere negligence does not state a valid claim for mistreatment under the Eighth Amendment. *See Farmer*, 511 U.S. at 835; *Estelle*, 429 U.S. at 106. Dr. Vadlamudi is entitled to summary judgment with respect to the Eighth Amendment claim.

### 3. R.N. Manzardo

Plaintiff has alleged three causes of action against R.N. Manzardo. In his Nineteenth cause of action, plaintiff alleged that R.N. Manzardo refused to grant plaintiff's requests to provide him with "adequate and/or alternative medication(s)" to alleviate his pain. Compl. at ¶¶ 197-98. The Twentieth cause of action alleged that the nurse refused "to inform the physician or nurse supervisor that [p]laintiff is routinely sent to healthcare by non-medical staff when [p]laintiff is suffering from a headache without any medication because he runs out each month." *Id.* at ¶¶ 199-200. The Twenty-First cause of action, plaintiff alleged that R.N. Manzardo delayed his access to medical care by failing to inform a physician or nurse supervisor that plaintiff's sinuses had been inflamed for at least 1 1/2 years. *Id.* at ¶¶ 201-02. Plaintiff's claims arise from three alleged

incidents with R.N. Manzardo: July 2, 2007 (plaintiff did not administer any treatment for plaintiff's alleged pain in his "left maxillary sinus"); December 2, 2008 (Manzardo informed plaintiff that he can only see the doctor every six months for a neurological evaluation); and January 15, 2009 (when Manzardo would not dispense the Zomig prescription early and had plaintiff come in for an evaluation by another nurse).

In response to the allegations in the complaint, R.N. Manzardo executed an affidavit stating that he evaluated plaintiff on July 2, 2007 and told plaintiff to notify health services if the frequency or intensity of the headaches increased. Manzardo Aff. at ¶ 3. Then, on December 2, 2008, plaintiff came for a scheduled evaluation and advised Manzardo that he needed to be evaluated by a physician. *Id.* at ¶ 4. R.N. Manzardo told plaintiff that he needed to send a kite for the evaluation, instructed him to continue treatment as ordered, and scheduled plaintiff for an appointment at the KCF Chronic Care Clinic Nurse for evaluation regarding the Neurological Clinic on December 5, 2008. *Id.* On January 15, 2009, plaintiff's work supervisor requested that plaintiff be given his Zomig prescription one day early. *Id.* at ¶ 5. Manzardo had plaintiff sent to health care for evaluation by another nurse. *Id.* In his response, plaintiff disputes the frequency and substance of the contact with R.N. Manzardo, claiming to have raised the issue of his treatment on numerous occasions: July 2, July 3 and November 26, 2007; and February 27, September 24, and December 2, 2008. Plaintiff's Response at p. 20; Plaintiff's Exhibits (docket no. 81-3).

The gist of R.N. Manzardo's argument is that while he evaluated plaintiff, he was not authorized to direct plaintiff's physicians to follow a different course of treatment or alter the medications or treatments ordered by the physicians. The court notes that Manzardo has not submitted an affidavit or identified other evidence to either support these assertions or dispute

plaintiff's claims. Nevertheless, the court concludes that plaintiff's allegations against R.N. Manzardo do not establish an Eighth Amendment claim.

Plaintiff's complaint is limited to alleged wrongful acts on three dates, July 2, 2007, December 2, 2008, and January 15, 2009. Plaintiff's interaction with Manzardo on other dates is not relevant to his claims in this action. The allegations in plaintiff's complaint do not reflect deliberate indifference to his serious medical needs. Furthermore, the medical records (provided by plaintiff) reflect that R.N. Manzardo provided medical treatment to plaintiff on both July 2, 2007 and December 2, 2008. *See* docket no. 81-3 at pp. 7-8 and 88. On July 2, 2007, R.N. Manzardo examined plaintiff, found nothing abnormal and advised him to continue his regimen. *Id.* On December 2, 2008, plaintiff demanded to see a doctor, stated he did not need to see a nurse and then left abruptly. *Id.* Finally, the court finds no constitutional violation in a nurse advising a patient that they cannot have medication contrary to the prescription. Accordingly, R.N. Manzardo's motion for summary judgment should be granted with respect to the Eighth Amendment claim.

### 4. R.N. Sizer

Plaintiff's three causes of action against R.N. Sizer are identical to those asserted against R.N. Manzardo. In his Twenty-Second cause of action, plaintiff alleged that R.N. Sizer refused to grant plaintiff's requests to provide him with "adequate and/or alternative medication(s)" to alleviate his pain. Compl. at ¶¶ 203-04. The Twenty-Third cause of action alleged that the nurse refused "to inform the physician or nurse supervisor that [p]laintiff is routinely sent to healthcare by non-medical staff when [p]laintiff is suffering from a headache without any medication because he runs out each month." *Id.* at ¶¶ 205-06. In the Twenty-Fourth cause of action, plaintiff alleged

that R.N. Sizer delayed his access to medical care by failing to inform a physician or nurse supervisor that plaintiff's sinuses had been inflamed for at least 1 1/2 years. *Id.* at ¶¶ 207-08.

Plaintiff's claims arise from two alleged incidents with R.N. Sizer: July 3, 2007 (R.N. Sizer noted that plaintiff's nasal passages were red and swollen, but no treatment was administered); and April 22, 2009 (In response to a kite on April 22, 2009, R.N. Sizer advised plaintiff that he was on call to see the doctor on either April 23rd or April 24th). In his affidavit, R.N. Sizer stated that he evaluated plaintiff on July 3, 2007. Sizer Aff. at ¶ 3. At that time, R.N. Sizer found that plaintiff had no outward signs of pain and no indications that he needed immediate follow up at that time. *Id.* Plaintiff refused a "lay in" for the day. *Id.* Sizer instructed plaintiff to follow up with the doctor, noting that plaintiff already had an appointment scheduled. *Id.* R.N. Sizer denied plaintiff's allegation that he responded to a kite on April 22, 2009, there being no record in plaintiff's medical record that he issued such a response. *Id.* at ¶ 4.

In his response, plaintiff disputes the frequency and substance of the contact with R.N. Sizer, claiming to have raised the issue of his treatment on numerous occasions: June 12, July 3, September 6, and October 25, 2007; January 24 and September 23, 2008; and April 20, April 28 and May 12, 2009. Plaintiff's Response at p. 14; Plaintiff's Exhibits (docket no. 81-3).

As with R.N. Manzardo, the gist of R.N. Mizer's argument is that while he evaluated plaintiff, he was not authorized to direct plaintiff's physicians to follow a different course of treatment or alter the medications or treatments ordered by the physicians. The court notes that Sizer has not submitted an affidavit or identified other evidence to either support these assertions or dispute plaintiff's claims. Nevertheless, the court concludes that plaintiff's allegations against R.N. Sizer do not establish an Eighth Amendment claim.

Plaintiff's complaint is limited to alleged wrongful acts on two dates, July 3, 2007 and April 22, 2009. Plaintiff's interaction with R.N. Sizer on other dates are not relevant to his claims. The allegations in plaintiff's complaint do not reflect deliberate indifference to his serious medical needs on the two occasions at issue in this action. In his response, plaintiff admits that R.N. Sizer did not respond to a kite on April 22, 2009 as alleged in the complaint. Furthermore, the medical records (provided by plaintiff) reflect that R.N. Sizer provided medical treatment to plaintiff on July 3, 2007. *See* docket no. 81-3 at pp. 9-10. At that time, the nurse found plaintiff's systems to be normal with no outward symptoms of pain. *Id.* R.N. Sizer told plaintiff to continue with cafgfergot [sic], increase fluids and take over the counter analgesics as directed. *Id.* The nurse noted that plaintiff "refused lay-in." *Id.* There is no basis for to support an Eighth Amendment claim against this defendant. Accordingly, R.N. Sizer's motion for summary judgment should be granted with respect to the Eighth Amendment claim.[11]

### D. Summary of rulings on defendants' motion for summary judgment

In summary, defendants Dr. Pandya, Dr. Vadlamudi, Ms. Ayers, R.N. Manzardo, and R.N. Sizer are entitled to summary judgment as to the Eighth Amendment claims. The only claims that remain against these defendants are the "causes of action" alleging negligence under state law.

## IV. Plaintiff's state law claim for negligence

As discussed above, the court recommends dismissal of plaintiff's federal claims asserted against Dr. Vadlamudi, Dr. Pandya, R.N. Manzardo, R.N. Sizer, Ms. Ayers, Dr. Holmes, N.P. Hammond and CMS.[12] The remainder of plaintiff's claims against these defendants involve

---

[11] The court having no constitutional violations by the MDOC defendants, it is unnecessary to address their claims for qualified immunity or Eleventh Amendment immunity.

[12] Plaintiff did not exhaust any claims, state or federal, against Dr. DeMasi.

a claim of negligence in violation of Michigan state law. Section 1367 of Title 28 of the United States Code provides that "the district court shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form a part of the same case or controversy." 28 U.S.C. § 1367(a). Here, the court exercised its supplemental jurisdiction over plaintiff's state law claims, because those claims appeared intimately related to alleged § 1983 violations. The dismissal of plaintiff's federal claim against defendants, however, requires the court to re-examine the issue of supplemental jurisdiction for state law claims against this defendant. Section 1367(c)(3) provides that a district court may decline to exercise supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction." Thus, once a court has dismissed a plaintiff's federal claims, the court must determine whether to exercise, or not to exercise, its supplemental jurisdiction under § 1367. *See Campanella v. Commerce Exchange Bank*, 137 F.3d 885, 892-893 (6th Cir. 1998).

As a general rule "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254-1255 (6th Cir. 1996). Here, the Court has rejected plaintiff's federal claims. There is no reason to retain supplemental jurisdiction over plaintiff's state law claims, and the court should dismiss all of the state law claims asserted against Dr. Vadlamudi, Dr. Pandya, R.N. Manzardo, R.N. Sizer, Ms. Ayers, Dr. Holmes, N.P. Hammond and CMS.

## V.    Plaintiff's second and third motions for preliminary injunctions

Finally, plaintiff has moved for two more preliminary injunctions in this matter. Plaintiff's second motion for a preliminary injunction (docket no. 76) asks this court to order defendants to provide him with immediate treatment, i.e., "a follow-up visit with Ear, Nose and

Throat Specialist Dr. Slater in Cheboygan, Michigan, and any other treatment deemed necessary by Dr. Slater to correct Plaintiff's ongoing medical condition." Plaintiff's third motion (docket no. 93) is directed at the MDOC defendants. In this motion, plaintiff states that Ms. Ayers has advised him that the Zomig prescription will expire in May 2010. Plaintiff seeks an order directing the MDOC defendants to renew this prescription.

"The general function of a preliminary injunction is to maintain the status quo pending determination of an action on its merits." *Blaylock v. Cheker Oil Co.*, 547 F.2d 962, 965 (6th Cir. 1976). A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his burden of proving that the circumstances clearly demand it. *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002); *Fort Wayne Women's Health Organization v. Brane*, 734 F.Supp. 849, 850 (N.D. Ind. 1990). Where a prison inmate seeks an order enjoining state prison officials, this court is required to proceed with the utmost care and must recognize the unique nature of the prison setting. *See Kendrick v. Bland*, 740 F.2d 432, 438, n. 3 (6th Cir. l984).

In reviewing requests for injunctive relief, the court considers (1) whether the movant has shown a strong or substantial likelihood or probability of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the preliminary injunction will cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *See Rock & Roll Hall of Fame v. Gentile Productions*, 134 F.3d 749, 753 (6th Cir. 1998). The four factors listed above are meant to be balanced as they guide the court in exercising its discretion; they are not due rigid application and need not be assigned equal weight. *In re Eagle-Pitcher Indus., Inc.,* 963 F.2d 855, 859 (6th Cir. 1992).

40

Here, the court has recommended dismissal of plaintiff's claims against all defendants. This resolution would preclude the issuance of a preliminary injunction. Even if the court were to consider the matter, the recommendation would be to deny the motions because plaintiff has not shown a strong or substantial likelihood or probability of success on the merits. On the contrary, the court finds no basis for this Eighth Amendment action. Furthermore, plaintiff is asking this court to exercise medical judgment by ordering specific treatment by an ENT and directing his physicians to prescribe a specific medication. Courts generally do not intervene in questions of medical judgment. *See Youngberg v. Romeo*, 457 U.S. 307, 321 (1982) (observing in the context of the treatment of an involuntarily committed mentally retarded individual that, "the Constitution only requires that the courts make certain that professional judgment in fact was exercised" and that "[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made") (internal quotation marks omitted). *See also Westlake*, 537 F.2d at 860 n. 5 ("federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law"). The record reflects that plaintiff has received *extensive and continuous* medical treatment for his headaches. It is not appropriate for this court to direct plaintiff's medical providers in matters of medical judgment, such as prescribing specific medications or visiting a particular specialist.

Furthermore, the court agrees with defendants that public interest favors deference to MDOC officials and medical personnel in their operation of the state's correctional facilities. Prisoners should not dictate the day-to-day operation of the prison, which, in this case, includes the prisoner's demand for particular medications, physicians and medical procedures. As one court observed, "[t]he Constitution decidedly does not require states to make prisons comfortable, and a

prison sentence is not a voucher for free health care on demand." *Lee v. Beard*, No. 4:CV-03-1026, 2008 WL 744736 at *8 (M.D.Pa. March 18, 2008).  For these reasons, plaintiff's motions for preliminary injunctions should be denied.

## VI.    Recommendation

In sum, I respectfully recommend that defendants' motion to dismiss (docket no. 46) be **GRANTED** as to defendants CMS, Dr. Holmes, N.P. Hammond and Dr. DeMasi, and that this action be **DISMISSED** as to these defendants.

I further recommend that defendants' motion for summary judgment (docket no. 38) be **GRANTED** as to defendants Dr. Vadlamudi, Dr. Pandya, R.N. Manzardo, R.N. Sizer and Ms. Ayers, and that this action be **DISMISSED** as to these defendants.

I further recommend that plaintiff's motions for preliminary injunctions (docket nos. 76 and 93) be **DENIED**.

I further recommend that plaintiff's state law claims against defendants CMS, Dr. Holmes, N.P. Hammond, Dr. Vadlamudi, Dr. Pandya, R.N. Manzardo, R.N. Sizer and Ms. Ayers, there being no reason to retain supplemental jurisdiction pursuant to 28 U.S.C. § 1367.


Dated:  August 9, 2010                           /s/ Hugh W. Brenneman, Jr.
                                                 HUGH W. BRENNEMAN, JR.
                                                 United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).